**SANDRA AND PATRICK CORNELIUS, Appellants/Plaintiffs**
**v.**
**BANK OF NOVA SCOTIA, Appellee/Defendant**

S. Ct. Civil No. 2015-0058
Supreme Court of the Virgin Islands
August 8, 2017

SANDRA and PATRICK CORNELIUS, St. Thomas, USVI, *Pro se*.

CAROL ANN RICH, ESQ., Dudley Rich Davis LLP, St. Thomas, USVI, *Attorney for Appellee*.

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, *Associate Justice*.

## OPINION OF THE COURT

### (August 8, 2017)

SWAN, *Associate Justice*. Appellants, Sandra and Patrick Cornelius, seek reversal of the trial court's judgment, which concludes that they breached the terms of an automobile loan they had with Appellee, the Bank of Nova Scotia. Appellants also implore us to reverse the amount of damages awarded to Appellee. Additionally, Appellants argue that the trial court erred when it failed to award damages for loss of use of their 2007 Dodge Caravan ("Vehicle"), failed to award damages based on the "replacement value" of the Vehicle, and failed to award punitive damages. Lastly, Appellants argue that Appellee's counterclaim for breach of contract "is not legitimate." For the reasons expounded below, the judgment is vacated and the matter will be remanded for further proceedings.

## I. FACTS AND PROCEDURAL HISTORY

On June 30, 2010, Appellants, while represented by counsel, filed a complaint, with several attached exhibits, in the Superior Court of the Virgin Islands. The allegations in the complaint were basic. Appellants contended that they were the registered owners of the Vehicle on June 22, 2010, when Appellee repossessed it. These allegations were supported by exhibit B, a letter from Appellee notifying the Bureau of Motor Vehicles ("BMV") that its lien on the Vehicle had been released. In paragraph 9 of the complaint, Appellants sought damages for "the embarrassment of having their vehicle 'repossessed', the inconvenience of suddenly being deprived of transportation, the cost of renting a substitute vehicle, the inconvenience of not having a vehicle of the capacity to which they [were accustomed], and the cost of legal consultation and assistance." In their prayer for relief, Appellants asserted a claim for punitive damages.

Appellee answered by denying the allegations in the complaint and propounding a counterclaim in its answer. In its counterclaim, Appellee

810

asserted that Appellants had executed a note in which they promised to pay Appellee a specific sum of money plus interest and that the note was secured by a security agreement, which identified the Vehicle as security for the loan. Likewise, Appellee alleged that the terms of the promissory note made the full balance due and payable upon any default and that Appellants had defaulted on the note. Therefore, Appellee sought the balance due on the promissory note for breach of its terms.

The Appellants filed an answer to Appellee's counterclaim, in which they denied the existence of an enforceable note, and they likewise asserted that Appellee had no security interest in the Vehicle. Subsequently, Appellants state that they "received a loan to purchase the said [Vehicle] in November 2009 and signed whatever papers [were] given to them. The [Vehicle] was security for the loan." Appellants alleged that Appellee had "giv[en] up" its security interest, and by so doing, Appellants "became the full owner[s] of the vehicle."

On February 5, 2015, a bench trial was held. In construing the complaint, the trial court concluded that two causes of action were alleged, one for replevin and one for conversion. Similarly, Appellee's counterclaim was construed as a claim for breach of contract.

Mr. Cornelius testified first. He asserted that the Vehicle had been improperly repossessed by Appellee, and he elucidated the circumstances that resulted in the filing of the complaint. On the day the Vehicle was repossessed, Mr. Cornelius had driven it to his workplace in Tutu Park Mall, and during the work-day, an All Around Towing Company employee appeared and explained to Mr. Cornelius that Appellee had requested that the Vehicle be repossessed. After the Vehicle was towed, Mr. Cornelius made a police report, asserting that Appellee had improperly repossessed the Vehicle.

Mr. Cornelius then explained the basis for his belief that the repossession was improper. He had received two "letters" from Appellee that, in his opinion, had requested that he and his wife release the lien against the Vehicle. They did and, in response, went to Appellee to inquire why the release of the lien had been requested. Appellee's employee told Appellants that an insurance policy on the Vehicle had paid the balance on the loan. Appellants then sought further clarification from Appellee's main office, but Appellee's employees could not locate its loan file. In support of this belief, Mr. Cornelius offered four documents into evidence, which were as follows: first, a letter that was to be sent to the

811

motor vehicle registry; second, a letter to be filed at the Lieutenant Governor's office, the office designated by law for the filing of UCC documents, to have the lien on the Vehicle released; third, a document from the Lieutenant Governor's office releasing the lien; and fourth, a document from the office of the motor vehicle registry releasing the lien.

On cross-examination, Mr. Cornelius testified as follows. He confirmed that he co-signed the loan obtained by his wife to purchase the Vehicle and that only two payments had been made on this loan. He was presented with Defendant's Exhibits 1 and 2, and he confirmed that the signatures on the exhibits were those of him and of his wife but asserted that he could not remember the documents because he attended the closing of the sale for the Vehicle only to cosign the documents for the loan and, therefore, did not scrutinize or review the documents he signed. While Mr. Cornelius could not remember the total amount of the loan, he recalled that the loan agreement provided that the loan payments were to be deducted from Ms. Cornelius' salary check. He further confirmed that, following their failure to make any payments on the loan after their second payment, they received phone calls from Appellee's employees regarding their default on the loan. When asked if he expected to make more than two payments when they entered into the loan contract, Mr. Cornelius answered, "No, Your Honor. That was not the agreement. The agreement was to pay for the vehicle. When we went to take out the vehicle, the agreement was to pay whatever was the agreement for the vehicle, to pay it off. That was the agreement." Mr. Cornelius also confirmed that the Vehicle had not been in an accident subsequent to their purchasing it. Importantly, the lack of an accident made Mr. Cornelius suspect that something had occurred in error when they received a notice of release of the lien. He explained, "That's why I said again, that's what we wanted to know, what was going on, why did the bank d[o] what they did."

In providing rebuttal after cross-examination, Mr. Cornelius further asserted that he and his wife fully expected to pay for the Vehicle, stating, "There was a clear understanding and agreement, so much you'll pay for the vehicle and, yes, we came to that agreement." Ms. Cornelius declined to testify. Appellants never presented any other witnesses.

Appellee then presented its case. A "Site Representative" for Appellee testified. Appellee's first exhibits were as follows: Exhibit 1, a loan application completed by the Appellants; Exhibit 2, Appellants' Retail

Installment Sale Contract; Exhibit 3, a financial statement enumerating the terms of payment signed by both Appellants; Exhibit 4, the Payroll Deduction Agreement signed by Ms. Cornelius; Exhibit 5, the checks making payment on the loan principal to the auto dealer pursuant to the loan agreement; Exhibit 6, a UCC Financing Statement used in an erroneous attempt to secure a lien against the Vehicle; and Exhibit 7, a certificate of title for the Vehicle.[1]

Appellee elucidated that Appellants had received "indirect lending," lending in which the customer goes directly to the car dealer to complete an application for the loan, Exhibit 1, which contains all of the customer's personal information. The car dealer would also provide the customer with a list of additional information/documents to be provided and to complete the Retail Sales Contract. After the Retail Sales Contract is approved, the customer is given a list of conditions that must be satisfied in order for the loan to be approved. Appellee further explained that Exhibit 2, a single document titled "Retail Installment Sale Contract," was both the Appellants' promise to pay the loan and the security agreement in one contract. Exhibit 2 provided the terms under which the Vehicle would be repossessed, if necessary, and further provided that the Appellants were obligated to pay any attorney's fees incurred by the creditor due to enforcing the loan contract.

When the loan was given to the Appellants, the initial application was processed based on an error in the monthly payment calculation. Therefore, this incorrect loan was "paid in full" by Appellee, and the correct terms of the loan were entered into the Appellee's electronic records to reflect the correct payment. This information was disclosed on

---

[1] We note Appellee's UCC Financing Statement was "not necessary or effective to perfect [its] security interest in [the Vehicle]" 11A V.I.C. § 9-311(a)(2). Rather, to perfect its interest in the Vehicle, Appellee needed to add its name to the Vehicle's certificate of title. *See* 20 V.I.C. § 252(b) ("A security interest is perfected by the delivery to the BMV of the existing certificate of title, if any, an application for certificate of title contained the name and address of the lienholder and the date of his security agreement and the required fee and a copy of the registration card. It is perfected as of the time of its attachment if the delivery is completed within 10 days thereafter, otherwise, as of the time of the delivery."); 11A V.I.C. § 9-303(c) ("Applicable Law. The local law of the jurisdiction under whose certificate of title the goods are covered governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in goods covered by a certificate of title from the time the goods become covered by the certificate of title until the goods cease to be covered by the certificate of title.").

Exhibit 2. According to the Appellee's evidence, the "pay off" is a process internal to Appellee where Appellee classifies a loan with errors as paid and re-issues a "new" loan in accordance with the correct, originally agreed-upon loan terms.

Appellee then presented Exhibit 9, a written demand for payment of the loan. Appellee's witness explained that the demands for payment are made once a loan is delinquent, and the customer has been orally so informed. The demands are used to inform the debtor that his loan is in default. They likewise state the past due amount, the existing balance, and any security held for the loan, as well as informing the debtor of the consequences of failing to make the loan current. Exhibit 9 was dated May 5, 2010.

Exhibit 10, the loan's history, disclosed the payments made and other pertinent information. Exhibit 11, the payoff amount as of February 5, 2015, and Exhibit 12, a document listing all the storage fees from the date of repossession to January 31, 2015, were presented. The original loan was in the amount of $13,845 with an interest rate of 7%. There were also repossession fees in the amount of $250. Because Appellants had made only two payments as of the day of the trial, the total amount owed was $19,741.39, including accrued interest. Appellee then presented a witness who offered an appraisal of the Vehicle and who determined that the 2010 value of the Vehicle was $11,197 and that the 2014 value was $5,400.

The court recited its findings of fact into the record and announced its judgment on May 26, 2015. The trial court concluded that Appellants' filing of the UCC termination statement, although done in error, constituted an effective termination of the Appellee's security interest. Therefore, the trial court reasoned that Appellee had no right to repossess the Vehicle. The court further concluded that Appellee was liable to Appellants for damages pursuant to 11A V.I.C. § 9-625, under which the minimum award of damages just exceeded $3,500. The court explicated that, because Appellee had no right to repossess the Vehicle, Appellants were the lawful possessors of the Vehicle at the time of Appellee's repossession. Accordingly, Appellants were entitled to damages for the fair market value of the Vehicle in 2010 ($11,197) pursuant to 11A V.I.C. § 9-625. As an alternative basis for its ruling, the trial court also held that Appellants had proven their claim of conversion. The trial court reasoned that, because the damages were the same for either cause of action, recovery for the Appellants was limited to the value of the Vehicle.

Addressing the claim of punitive damages, the trial court concluded that there was no evidence of Appellee's conduct being so reprehensible as to warrant deterrence by the court. Accordingly, the claim for punitive damages was denied.

Concerning Appellee's counterclaim for breach of contract, the court determined that the termination of the security interest had no effect on the contractual loan obligation. Additionally, the court adjudged that Appellants failed to satisfy their financial obligations under the loan agreement. In a judgment entered on July 14, 2015, the Superior Court memorialized its May 26, 2015 bench rulings, a setoff of the $11,197 amount awarded to Appellants on their claims against the $18,285.59 awarded to the bank on its counterclaim, and awarded the bank $7,088.59, plus post-judgment interest accruing from May 27, 2015 up to and including the day the judgment is satisfied.

## II. JURISDICTION

This Court has jurisdiction over all appeals arising from a final judgment of the Superior Court. 4 V.I.C. § 32(a). A final judgment is an order from a court that ends the litigation on the merits, leaving nothing else for the court to do except execute the judgment. *Caribbean Healthways, Inc. v. James*, 55 V.I. 691, 696-97 (V.I. 2011) (citing *Rojas v. Two/Morrow Ideas Enters., Inc.*, 53 V.I. 684, 691 (V.I. 2010)); *see Ramirez v. People*, 56 V.I. 409, 416 (V.I. 2012). The entry of a final judgment, order, or decree implicitly denies all pending motions. *Simpson v. Bd. of Dirs. of Sapphire Bay Condo. W. (Simpson II)*, 62 V.I. 728, 731 (V.I. 2015). The order from which Appellants appeal was entered July 14, 2015, and the notice of appeal was filed June 30, 2015. While the notice of appeal was premature in the sense that it was filed prior to the entry of the Superior Court's written judgment, the appeal is deemed timely filed by operation of V.I. R. APP. P. 5(a)(1), providing that "[a] notice of appeal filed after the announcement of a judgment or order — but before entry of the judgment or order — is treated as filed on the date of and after the entry of judgment." *See also Rivera v. People*, 64 V.I. 540, 551 n.5 (V.I. 2016) ("A notice of appeal filed after the announcement of an order or judgment, but before the entry of a writing memorializing the same, is treated as filed on the date of and after such entry . . . and is considered timely filed." (citations and internal quotation marks omitted)). Therefore, this Court has jurisdiction to adjudicate this appeal,

which was timely filed. V.I. R.APP. P. 5(a)(1); *see Billu v. People*, 57 V.I. 455, 460 n.3 (V.I. 2012) (noting that, where an amended rule utilized the same language as the rule in effect at the time the notice of appeal was filed, the amended rule is applied); *cf. Webster v. FirstBank P.R.*, 66 V.I. 514, 519 n.3 (V.I. 2017) (applying former rules of the Superior Court in effect at the time the judgment was entered); *Rennie v. Hess Oil V.I. Corp.*, 62 V.I. 529, 548 n.13 (V.I. 2015) (applying version of statute in effect at the time the action was commenced).

## III. STANDARD OF REVIEW

Appellants raise four issues. First, they claim error by the trial court for failing to address "in full the loss of use of the [Vehicle]." Second, they claim error by the trial court because the trial court awarded them damages in the amount of the assessed value of the Vehicle at the time of repossession rather than the "replacement value" of the Vehicle. Third, they challenge whether Appellee's counterclaim was "a legitimate claim." The court interprets this contention to be a challenge to whether Appellee's claim for breach of the loan contract was legally sufficient. Finally, Appellants challenge the trial court's finding that they were not entitled to punitive damages.

The trial court's interpretation of a statute is subject to plenary review. *Bradford v. Cramer*, 54 V.I. 669, 672 (V.I. 2011). The standard of review for this Court's examination of the trial court's application of the law is plenary, and its findings of fact are reviewed for clear error. *Rodriguez v. Bureau of Corr.*, 58 V.I. 367, 371 (V.I. 2013), *overruled in part on other grounds by Rivera-Moreno v. Gov't of the V.I.*, 61 V.I. 279, 302-03 (V.I. 2014); *Blyden v. People*, 53 V.I. 637, 646 (V.I. 2010).

A finding of Plain Error requires the existence of (1) an error, (2) that was obvious under existing law, and (3) affected substantial rights. *Francis v. People*, 52 V.I. 381, 390-91 (V.I. 2009); *see also Duggins v. People*, 56 V.I. 295, 300 (V.I. 2012).[2] A failure to appropriately consider the requirements of a statute in applying it is reversible error. *Dupigny v.*

---

[2] The Court notes that the terminology used under this standard of review is often confusing given the multiple uses in multiple combinations of the words "plain" and "error." For clarity's sake, in the present opinion, the Court will employ the term "Plain Error" to refer to the presence of the first three factors of this test and will employ the term "Plain Error Review" to refer to the analysis that is conducted when considering whether the fourth factor —

*Tyson*, 66 V.I. 434, 452 (V.I. 2017) (remanding for consideration in the first instance of whether a child support award worked a hardship). When Plain Error exists, this Court will conduct a Plain Error Review to determine if the error, though affecting a substantial right, seriously affected "fairness, integrity, or public reputation of the judicial proceeding," thus warranting reversal. *Francis*, 52 V.I. at 391.

## IV. DISCUSSION

### A. The Superior Court's Findings of Fact

As reflected in its May 26, 2015 bench ruling, the Superior Court concluded that the Appellants purchased the Vehicle for $17,150 from Community Motors on November 20, 2009. Appellants applied for and obtained a loan in the amount of $13,845 with a monthly payment of $332.50. Additionally, Appellants executed two documents authorizing payroll deductions to pay the monthly $332.50 payment. They paid two payments on the loan. Upon reviewing the loan documents for electronic entry into Appellee's records, it was discovered that Appellants' monthly payment had been miscalculated and should have been $331.54. In order to correct this error, Appellee, in its internal records, closed out the original "loan" and created a new loan with the correct payment information. Appellee's December 24, 2009 letter to Appellants informed them that the loan had been repaid and that Appellee's lien on the Vehicle had been released.

Appellants received the letter dated December 24, 2009, informing them that the lien against the Vehicle had been released because of satisfaction of payments. Appellants had also filed paperwork with the appropriate government agency terminating Appellee's erroneous UCC-1 financing statement. Additionally, they received a certificate of title from the BMV informing them that there was no lien against the Vehicle. Nonetheless, after the repossession of the Vehicle, the BMV issued a certificate of title noting that Appellee had a lien upon the Vehicle. Appellants received notice from Appellee that they were delinquent in their loan; however, they failed to make any further payments after the notice. Therefore, the Vehicle was repossessed on June 22, 2010.

---

whether the asserted error seriously affected either the fairness, integrity, or public reputation of the judicial proceeding — exists warranting reversal. *See Francis*, 52 V.I. at 390-91.

Each of these facts was confirmed by at least one witness at trial. A discernible majority of these facts was never contradicted, and some were admitted by Appellants. Further, any conflicting evidence is of no consequence because a finding of fact that adopts one view of the evidence is not clearly erroneous even if there are multiple conclusions that could be drawn from the same evidence. *Bryan v. Gov't of the V.I.*, 150 F. Supp. 2d 821, 827 (D.V.I. App. Div. 2001) (per curiam); *cf. Rivera*, 64 V.I. at 553-57 (standard for credibility determination on appeal). Therefore, the Court accepts these findings in considering the merits of Appellants' issues presented on appeal. *See Gov't of the V.I. v. Olinsky*, 119 Fed. Appx. 405, 406 (3d Cir. 2005) ("On appeal, [Defendant] does not make a substantial argument that we should determine that the territorial court's factual findings were clearly erroneous and, as we see no reason to disturb them, we accept them."); *e.g., Home Bank & Trust Co. v. Cedar Bluff Cattle Feeders, Inc.*, 25 Kan. App. 2d 152, 959 P.2d 934, 938-39 (1998).

## B. Validity of Counterclaim for Breach of Loan Contract

Appellants do not succinctly frame their arguments. However, Appellants argue that they "do not have an agreement with the [A]ppellee[ ] in relation to the unsecured loan and therefore ha[ve] no obligation towards such. The Counter-claim [sic] is mischievous." As this statement illustrates, Appellants are challenging the legal conclusion that the loan and security agreement survived Appellee's letter erroneously acknowledging repayment of the loan and release of its security interest in the Vehicle. Appellants further challenge the legal conclusion that they were still obligated to pay the amount due under the loan and security agreement. Because the validity of any damages award is dependent on the legal status of the parties under the loan and security agreement, this issue is considered first even though Appellants present them in a different order. *See Galloway v. People*, 57 V.I. 693, 699 n.3 (V.I. 2012).

■ As delineated below, because Appellee's December 24, 2009 letter to appellants erroneously informing them that the loan had been repaid and further informing them that the lien on the Vehicle had been released did not invalidate the terms of the loan and security agreement, Appellee stated a valid cause of action for breach of contract in its counterclaim, and Appellants were liable for the amount the parties agreed upon under that loan and security agreement. Preliminarily, it will assist in clarifying

the analysis if one understands what law is applicable to this case and why. Accordingly, a brief discussion of the contract formation process is imperative. Here, Appellants contracted to purchase the Vehicle from Community Motors. It was a contract between Appellants and Community Motors for the sale of consumer goods and was thus governed by 11A V.I.C. § 2-204. However, Appellants could not afford the full purchase price at the time of the purchase of the Vehicle. Therefore, they applied to Appellee for financing and received a loan.

 Once Appellee, on behalf of Appellants, paid Community Motors the purchase price of the vehicle, the contract for sale of consumer goods between Appellants and Community Motors was completed. *See generally Peppertree Terrace v. Williams*, 52 V.I. 225, 241 (V.I. 2009) (Swan, J., concurring) (noting that a contract is an oral or written promise or a promise inferred through conduct); *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 136-37, 3 L. Ed. 162 (1810) ("A contract is a compact between two or more parties, and is either executory or executed. . . . A contract executed is one in which the object of [the] contract is performed. . . ."). Unless agreed otherwise, title to consumer goods passes to the debtor despite a security interest in the same personal property held by a third party, in this instance the Appellee. 11A V.I.C. § 2-401(2). Therefore, Appellants held title to the Vehicle on the day it was repossessed. *See J.I. Case Credit Corp. v. Foos*, 11 Kan. App. 2d 185, 717 P.2d 1064, 1067 (1986) (noting the debtor held title subject to an unperfected security interest upon the erroneous filing of a termination statement); *Home Bank & Trust*, 959 P.2d at 939. At the time of the repossession, the only operative contract was the loan and security agreement between Appellants and Appellee, which provided both the terms for repayment of the loan and the terms upon which the loan was secured. Therefore, the determination of the lawfulness of Appellee's repossession of the Vehicle is governed by the UCC as adopted by the Legislature of the Virgin Islands.

 "The UCC does not require that a security interest be perfected by filing or otherwise in order to be valid." *Kan. State Bank v. Overseas Motosport, Inc.*, 222 Kan. 26, 563 P.2d 414, 417 (App. 1977) (collecting cases). Indeed, the requirements of enforceability of a security interest are listed in subsection 9-203(b), and conspicuously absent from these requirements is perfection. 11A V.I.C. § 9-203(b); *see Turbinator, Inc. v. Superior Court*, 33 Cal. App. 4th 443, 39 Cal. Rptr. 2d 342, 345 (1995)

("[A]n unperfected security interest is enforceable against all parties unless the holder of a later-acquired interest qualified under some other provision."); *cf. Roberge v. Bankers Trust Co.*, 84 A.D.2d 8, 446 N.Y.S.2d 443, 444 (1981) (explaining that sections 9-501 and 9-503 of the Uniform Commercial Code as adopted in New York, which are analogous to former 11A V.I.C. §§ 9-501 and 9-503, impose no requirement that a financing statement be filed in order to enable the creditor to effect physical repossession of the property that would otherwise qualify as the collateral).

 A security interest attaches when it becomes enforceable against the debtor. 11A V.I.C. § 9-203(a). Therefore, a secured party may take possession of collateral pursuant to a security agreement if the property may be repossessed from the defaulting debtor without a "Breach of Peace." 11A V.I.C. § 9-609(b) ("A secured party may proceed under subsection (a): . . . (2) without judicial process if it proceeds without breach of the peace."). Those portions of Article 9 of the UCC in the form enacted in the Virgin Islands, 11A V.I.C. § 9-201 *et seq.*, are devoid of any language indicating that a security agreement is only effective if perfected. *See In re Drewry*, 966 F.2d 236, 243 (7th Cir. 1992) ("A security agreement is generally effective according to its terms between parties even when it is unperfected."); *United States v. Agnello*, 344 F. Supp. 2d 360, 370 (E.D.N.Y. 2004) ("A security agreement is not invalid between the parties merely because it was not perfected. Perfection of an interest is important only to insure priority of the lien over intervening third-parties[.]" (citation and internal quotation marks omitted)); *Roberge*, 446 N.Y.S.2d at 444 (Article 9 "do[es] not require that the secured interest of the creditor be perfected in order to foreclose").

 No language in title 11A as implemented in the Virgin Islands provides that a loan for the purchase of consumer goods is considered satisfied simply because the holder of the note erroneously sent a notice of repayment and release of lien/security interest. Further, there is no common law principle that has been identified that would dictate such an outcome. Appellants admitted that they entered into the contract and that they only made two payments pursuant to that contract. Thus, the amount of the loan and the financing fees are indisputable. Further, a contract is only formed or modified to the extent there is mutual assent and mutual consideration. Therefore, it is undeniable that the full balance of the loan plus financing fees were owed to Appellee once Appellants signed all the

loan documents and took possession of the Vehicle. Indeed, they admitted these facts. A mistake by a lender that misinforms a debtor that the balance of his or her loan is satisfied is of no legal significance in a breach of contract analysis where there is no dispute, in fact, as to the amount owed. *See Peoples Bank of S.C., Inc. v. Robinson*, 272 S.C. 155, 249 S.E.2d 784, 786 (1978) (holding that the erroneous return of a promissory note and security agreement marked "Paid and Satisfied" did not "constitute a discharge under [the UCC]"); *Richardson v. First Nat'l Bank of Louisville*, 660 S.W.2d 678, 679-80 (1983) ("[A] clerical error does not have the legal effect of cancelling an existing debt or discharging an instrument." (citations omitted)). Considering the above, it is incontestable that the loan contract was breached when, after making only two payments, Appellants failed to make any further payments on the loan. *See generally Overseas Motosport*, 563 P.2d at 417-18.

■ ■ Therefore, Appellee was entitled to repossess the Vehicle pursuant to 11A V.I.C. § 9-609(b)(2) so long as doing so could be done without a Breach of Peace, and the trial court committed error when it concluded that Appellee had wrongfully repossessed the Vehicle. While it was error for the trial court to conclude that a secured party must perfect its security interest in collateral prior to repossession, no opinion of this Court has previously addressed this issue, and the trial court's ruling was not a plain error. *Murrell v. People*, 54 V.I. 338, 366 (V.I. 2010) (explaining that an error is only plain if it is clear under current law). Because this error was not challenged by Appellee and it does not meet the standards by which this Court could exercise its discretion and notice the error under Plain Error Review, we do not reverse on this basis. *See Nicholas v. People*, 56 V.I. 718, 743 n.18 (V.I. 2012).

■ Instead, because the trial court erred when it found that the repossession was wrongful based on its determination that Appellee's security interest had been terminated, no analysis was conducted in the first instance considering whether the facts of this case gave rise to a Breach of Peace. *See* 11A V.I.C. § 9-609(b)(2). When the trial court ruled that Appellee did not have a security interest in the Vehicle, it failed to consider whether the events at the time of the repossession of the Vehicle amounted to a Breach of Peace, which is Plain Error. *See Dupigny*, 2017 V.I. Supreme LEXIS 13, at *27. We have emphasized that such factual issues should be considered in the first instance in the trial court, as the trial courts have an essential role in developing the jurisprudence

of this Territory, and thoroughly argued and researched decisions from the trial court enable this Court to give thorough consideration to any interpretation a statute may be given. *Gov't of the V.I. v. Connor*, 60 V.I. 597, 604 (V.I. 2014); *e.g., Dupigny*, 2017 V.I. Supreme LEXIS 13, at *27.

 This Court has not considered what constitutes a Breach of Peace under Article 9 of the U.C.C., and consideration of the legislative intent is necessary. It is presumed that a legislature intends for an entire statute to be effective. *Gilbert v. People*, 52 V.I. 350, 356 (V.I. 2009). Therefore, we must give effect to all the words and provisions of a statute by considering the plain language in light of any statutory definitions, any words that have an accumulated legal meaning, and, absent such definitions, we apply the common, "dictionary," definition of any words. *Ubiles v. People*, 66 V.I. 572, 590 (V.I. 2017); *see also* 1 V.I.C. § 42. Determining the meaning of a statutory term requires consideration of the context, structure, placement, and other linguistic indicators in the statute. *Id.; e.g., Gilbert*, 52 V.I. at 356 (discussing the legal effect of the grammatical meaning of an adjective).

> A breach of the peace takes place when either an assault is committed on an individual or public alarm and excitement is caused. Mere annoyance or insult is not enough: thus at common law a household could not give a man into custody for violently and persistently ringing his doorbell. It is the particular duty of a magistrate or police officer to preserve the peace unbroken; hence if he has reasonable cause to believe that a breach of the peace is imminent he may be justified in committing an assault or effecting an arrest.

BLACK'S LAW DICTIONARY 201 (8th ed. 2004) (quoting R.F.V. HEUSTON, SALMOND ON THE LAW OF TORTS 131 (17th ed. 1977)). Breach of Peace is "the criminal offense of creating a public disturbance or engaging in disorderly conduct, particularly by making unnecessary or distracting noise." *Id.* Applying this accumulated legal meaning, it is questionable whether what occurred here constitutes a Breach of Peace, although other courts confronted with similar facts have found that a Breach of Peace occurred. *E.g., Waisner v. Jones*, 1988- NMSC 049, 107 N.M. 260, 755 P.2d 598 (1988); *Hollibush v. Ford Motor Credit Co.*, 179 Wis. 2d 799, 508 N.W.2d 449, 455 (Ct. App. 1993). Even though we find that Appellee had a valid security interest and right to repossess the Vehicle, we vacate and remand the award

of damages for further consideration of whether the actions in this instance amounted to a Breach of Peace making the repossession unlawful.

## C. Awards of Damages

Because Appellants raise issues likely to recur on remand, we address those here. *E.g.*, *Pickering v. People*, 66 V.I. 276, 291 (V.I. 2017).

### 1. Compensatory Damages

▉▉▉▉▉▉ Appellants argue that the trial court erred when it failed to award them the lost use value of the Vehicle and when it awarded them damages based on the 2010 assessed value of the Vehicle instead of the "replacement value." The shortcoming of both arguments, however, is that neither was raised nor substantiated by evidence presented at trial. Although we grant the Appellants additional leniency as *pro se* litigants, that leniency is not "a license [excusing compliance] with relevant rules of procedural and substantive law." *Simpson v. Golden* (*Simpson I*), 56 V.I. 272, 280 (V.I. 2010) (citation and internal quotation marks omitted). As we previously explained,

> The rules that require a litigant to brief and support his arguments, both here and before the Superior Court, are not mere formalistic requirements. They exist to give the Superior Court the opportunity to consider, review, and address an argument before it is presented to this Court. That requirement permits the Superior Court to develop the record so that, in the event of an appeal, this Court can then make informed rulings.

*Id.* at 280-81. Consistent with *Simpson I*, we decline to consider Appellants' arguments for additional damages that were neither raised nor substantiated by evidence presented at trial. Appellants already had their opportunity to prove their damages claim — they may not cure their evidentiary failure at trial by simply raising new, unsubstantiated facts on appeal. *See Carrillo v. CitiMortgage, Inc.*, 63 V.I. 670, 680 (V.I. 2015) (affirming summary judgment award where appellant did not "provide[ ] this [C]ourt with any proof to substantiate any of her arguments based on even a scintilla of evidence" (citations omitted)). Therefore, the award of damages is not erroneous based on these considerations.

823

## 2. Punitive Damages

■ Punitive damages are "damages awarded in cases of serious or malicious wrongdoing to punish or deter the wrongdoer or deter others from behaving similarly — called also exemplary damages, smart money." MERRIAM-WEBSTER'S DICTIONARY OF LAW 120 (2005); *see also* BLACK'S LAW DICTIONARY 448 (9th ed. 2009) ("Damages awarded in addition to actual damages when the defendant acted with recklessness, malice, or deceit; specif., damages assessed by way of penalizing the wrongdoer or making an example to others."). Punitive damages must be based upon conduct that is not just negligent but shows, at a minimum, reckless indifference to the person injured — conduct that is outrageous and warrants special deterrence. *See Davis v. Christian*, 46 V.I. 557, 565 (D.V.I. App. Div. 2005) (citing RESTATEMENT (SECOND) OF TORTS § 908); *cf. Brown v. V.I. Tele. Corp.*, 9 V.I. 108, 112 (V.I. Super. Ct. 1972) (citing RESTATEMENT OF CONTRACTS § 342; RESTATEMENT (SECOND) OF CONTRACTS § 355); *St. Croix Renaissance Group, LLLP v. St. Croix Alumina, LLC*, Civ. No. 04-67, 2011 U.S. Dist. LEXIS 58481, at *30 (D.V.I. May 31, 2011) (unpublished) (applying Delaware law).[3]

■ ■ As this Court has repeatedly emphasized, it is reversible error for the trial court to fail to conduct a "Banks Analysis" in the first instance. *Connor*, 60 V.I. at 604. Here, the trial court and the parties

---

[3] *See also Dunn v. HOVIC*, 1 F.3d 1371, 1380, 28 V.I. 467 (3d Cir. 1993) (citing RESTATEMENT (SECOND) OF TORTS § 908); *Berroyer v. Hertz*, 672 F.2d 334, 340 n.8, 19 V.I. 641 (3d Cir. 1982) (citing RESTATEMENT (SECOND) OF TORTS § 908 for the requirement that the conduct be reckless, "similar to that usually found in crime"); *Clarke v. Abramson*, Civ. No. 2004-111, 2007 U.S. Dist. LEXIS 78814, at *7 (D.V.I. Oct. 24, 2007) (citations omitted); *Hall v. Delta Air Lines, Inc.*, 340 F. Supp. 2d 596, 600, 46 V.I. 324 (D.V.I. 2004); *Nicholas v. Wyndham Int'l, Inc.*, 301 F. Supp. 2d 407, 410 (D.V.I. 2002) (citations omitted); *Guardian Ins. Co. v. Joseph*, 31 V.I. 145, 151 (D.V.I. App. Div. 1994); *Justin v. Guardian Ins. Co.*, 670 F. Supp. 614, 23 V.I. 278, 282-83 (D.V.I. 1987); *Shackelford v. P.R. Intern. Airlines, Inc.*, 16 V.I. 342, 346 (D.V.I. 198) (stating that the court must determine whether the conduct was reckless and wanton to justify punitive damages); *Mathurin v. Gov't of the V.I.*, 398 F. Supp. 110, 117, 12 V.I. 23 (D.V.I. 1975) (citing RESTATEMENT (SECOND) OF TORTS § 908 requiring that an employer be reckless in employing an employee to be liable for punitive damages); *Herman v. Hess Oil V.I. Corp.*, 379 F. Supp. 1268, 1276 n.5, 10 V.I. 521 (D.V.I. 1974); *cf. White v. S & E Bakery, Inc.*, 26 V.I. 87, 91 (V.I. Super. Ct. 1991) (citing CALAMARI ON CONTRACTS § 14-3 (2d ed. 1977)); *Clarke*, 2007 U.S. Dist. LEXIS 78814, at *6 (citing RESTATEMENT (SECOND) OF CONTRACTS § 355); *Four Winds Plaza Corp. v. Caribbean Fire & Assocs., Inc.*, 48 V.I. 899, 913, 915 (D.V.I. 2007) (same); *Hall v. Delta Air Lines, Inc.*, 340 F. Supp. 2d 596, 46 V.I. 324, 329 (D.V.I. 2004) (same); *Tradewinds, Inc. v. Citibank, N.A.*, 20 V.I. 131, 135 (D.V.I. 1983) (same).

entirely failed to consider whether the courts of the Virgin Islands have ever adopted a definition of punitive damages, failed to consider the majority rule among the jurisdictions of the United States, and failed to consider what rule is most appropriate for the Virgin Islands, the "Banks Factors." *Id.* at 603; *Ubiles*, 66 V.I. at 589-590. Although this failure is grounds for summary reversal, we need not reverse in this case because Appellants failed to offer any proof to establish a claim of punitive damages. *See Guardian Ins.*, 31 V.I. at 151 (denying award of punitive damages due to a complete lack of proof).

### 3. Calculation of Damages

A creditor[4] possesses an unequivocal duty to, after giving notice to the debtor,[5] dispose of any repossessed collateral in a commercially reasonable manner and apply the proceeds to the balance owed and turn over any surplus or demand any deficiency. 11A V.I.C. §§ 9-610(b), 9-627. When a creditor fails to dispose of collateral in a commercially reasonable manner, the debtor is entitled to damages for lost value of the collateral that resulted from the creditor's unreasonable conduct and will either reduce or eliminate any right to a deficiency judgment against the debtor. *See Westgate State Bank v. Clark*, 231 Kan. 81, 642 P.2d 961, 969 (1982); *Mack Fin. Corp. v. Scott*, 100 Idaho 889, 606 P.2d 993, 996 (1980).

The Vehicle was repossessed in 2010 and valued at $11,197, but the total of the loan was $13,845, a difference of $2,648. Yet, Appellee was awarded $7,088.59. While there are considerations of what interest was due under the contract for the commercially reasonable time it would have taken to dispose of the collateral, fees and expenses, etc., by any assessment, the award of damages appears excessive in light of what was due had the collateral been disposed of, more or less, contemporaneously with the Vehicle's repossession. Upon remand, the trial court is directed to make the appropriate factual findings necessary for determination of what was (1) the commercially reasonable timing and method of disposing of the collateral, the Vehicle, and (2) the correct award of

---

[4] A creditor is "one to whom a debt is owed; one who gives credit for money or goods. —Also termed debtee." BLACK'S LAW DICTIONARY 396 (8th ed. 2004).

[5] A debtor is "One who owes an obligation to another, esp. an obligation to pay money." BLACK'S L. DICT., at 433; *see also* UCC 9-102(a)(28).

damages in light of the parties' contractual obligations and what conduct was considered commercially reasonable.

## V. CONCLUSION

The trial court's ruling that the Appellee, Bank of Nova Scotia, had terminated its security interest, thus making its repossession of the Vehicle wrongful, was erroneous and is reversed. Additionally, because the trial court failed to consider whether a Breach of Peace occurred under the facts presented in this case, the damages award is vacated. Further, because the trial court failed to conduct a Banks Analysis when determining the applicability of punitive damages for cases such as this one, in the Virgin Islands, the trial court's ruling, without first determining the appropriate rule, was error. Finally, the trial court's failure to consider whether Appellee acted in a commercially reasonable manner, in disposing of the collateral, was error. The judgment is vacated, and this matter is remanded for proceedings consistent with this opinion.